# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

JULIAN R. BLACKSHEAR,

                Plaintiff,

v.

TINA AMIN, MARIANA TOKAR,
MICHELLE WILINSKI, MICHAEL
MAYER, AMY EPPING, DR.
MARCELO CASTILLO, STEPHANIE
O'NEILL, CHARLES VENA, and
JOHN and JANE DOES,

                Defendants.

Case No. 18-CV-853-JPS

**ORDER**

## 1.  INTRODUCTION

Plaintiff Julian Blackshear ("Blackshear") is currently incarcerated at Waupun Correctional Institution. At all times relevant to this suit, he was incarcerated at Racine Correctional Institution ("RCI"). In May and July of 2017, Blackshear was placed in clinical observation status due to threats of suicide. He alleges that the defendants, all RCI employees, either were deliberately indifferent to the hazards in his observation cell or failed to provide him proper medical attention while he was in observation status, all in violation of his rights under the Eighth Amendment.[1]

---

[1] Blackshear also named multiple John and Jane Doe defendants, but he did not file an amended pleading to name any of them. The Court permitted him ninety days from entry of the scheduling order to identify the Doe defendants and warned that failure to do so would result in dismissal of those defendants without further notice. (Docket #46 at 3). Because Blackshear never amended his pleading to identify the Doe defendants, those defendants are dismissed.

Blackshear has filed myriad motions in this case, including *inter alia* motions for the return of his pen, motions for daily legal recreation time, discovery-related motions, a motion for a "due process violation," motions for a preliminary injunction, and a summary judgment motion. The Court will address Blackshear's outstanding motions at the end of this order. The Court turns first, though, to the defendants' fully-briefed motion for summary judgment, (Docket #67), because it resolves this case in its entirety. As explained below, the defendants' motion will be granted, and this case will be dismissed.

## 2. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016).

## 3. RELEVANT FACTS

The following facts are material to the disposition of the defendants' motion for summary judgment. They are drawn from the parties' factual

briefing. (Docket #69–#77, #81–#83, #86, #93). The Court will discuss the parties' principal factual disputes as appropriate.[2]

At all times relevant to this suit, Blackshear was an inmate at RCI. The Defendants were all RCI employees: Stephanie O'Neill ("O'Neill") was a captain, Charles Vena ("Vena") was a sergeant, Tina Amin ("Amin") and Michael Mayer ("Mayer") were lieutenants, Amy Epping ("Epping") was a nurse, Marcello Castillo ("Dr. Castillo") was a psychiatrist, and Michelle Wilinski ("Wilinski") and Mariana Tokar ("Tokar") were psychological associates.

### 3.1    Blackshear's Mental Health Treatment

Wilinski first saw Blackshear on March 17, 2016. She noted that Blackshear was evasive about his current mental health concerns and his goals for treatment, and that his focus seemed solely to be receiving psychiatric medications. Blackshear disputes this, saying he was "undecided and impulsive," and that it was one of the first times he had sought help. (Docket #81 at 2). Wilinski did not see Blackshear again until 2017, when he was placed on observation status, as explained further below.

Dr. Castillo provided psychiatric care to Blackshear at various times between September 28, 2016 and April 27, 2017. Their first visit was occasioned by Blackshear's self-referral because he wanted to receive psychiatric medication. Dr. Castillo says that he believed Blackshear's sole purpose for the appointment was for secondary gain, such as getting a

---

[2]The Court will not discuss the instances where Blackshear says that he disputes the defendants' proposed fact but either cites no evidence in support of his dispute or includes an explanation of his dispute that does not actually address the defendants' proposed fact.

specific medication prescribed to him. This belief was based in part on the fact that Blackshear was not providing him with accurate or reliable information about his mental health and medical history. Blackshear disputes this, saying that he did in fact provide accurate information about his mental health.

Dr. Castillo requested Blackshear's previous medical and mental health records from hospitals in Chicago and Racine and he rescheduled Blackshear for a follow-up appointment to conduct a psychiatric evaluation. The evaluation took place on October 13, 2016. Blackshear claimed that he had diagnoses of schizophrenia, bipolar disorder, and reactive attachment disorder. Dr. Castillo thought it unlikely that someone would have all of these disorders together and, based on his evaluation, Dr. Castillo did not find any evidence to suggest that Blackshear suffered from any of these disorders. Instead, based on Blackshear's lack of symptoms, manipulative behavior for secondary gain, and apparent lying, Dr. Castillo believed that an accurate diagnosis for Blackshear was antisocial personality disorder. Blackshear disagrees with Dr. Castillo's conclusion, but he does not dispute that Dr. Castillo reached this conclusion during the evaluation. Dr. Castillo prescribed no medication, as there are no psychiatric medications approved to treat antisocial personality disorder.

On January 19, 2017, Dr. Castillo received the medical records that he had requested from a Chicago hospital. The records did not provide any evidence of a history of major mental illness or other reported medical history. As such, Dr. Castillo did not feel that adding psychiatric medication was necessary. Blackshear was scheduled for a follow-up appointment with Dr. Castillo for April 27, 2017 but refused to attend the appointment. Dr. Castillo did not see Blackshear again.

Along with his summary judgment opposition materials, Blackshear summitted myriad documents and records related to his medical history as a minor, including from a case manager in Walworth County and from Blackshear's high school, where he was put on a behavior modification plan. *See* (Docket #86 at Exhibit Z).[3] These documents indicate that Blackshear had a troubled youth, and that he was at various times evaluated for and possibly diagnosed with mental illnesses including reactive attachment disorder, antisocial behavior, and depression. *Id.* It appears he may have been treated with medications at some point, including antidepressants. *Id.* There is no evidence that Dr. Castillo had access to, or was provided with, any of these medical records when he was treating Blackshear.

### 3.2    Placements on Observation Status

Blackshear was placed on clinical observation status on three occasions relevant to this lawsuit: from May 21, 2017 through May 26, 2017, from June 20, 2017 through June 26, 2017, and from June 30, 2017 through August 7, 2017. While on observation status, an inmate is monitored every fifteen minutes to ensure his safety.

Blackshear was first placed on observation status on May 21 after reporting to security staff that he was suicidal. Wilinski saw Blackshear on May 24 for a mental status evaluation. During the evaluation, Blackshear stated that he could easily harm himself without access to any significant property. Because Blackshear alluded to thoughts of self-harm but did not

---

[3]The defendants object to the Court's consideration of these documents because Blackshear did not serve them on the defendants. The Court has reviewed Blackshear's exhibits and, because they do not change the outcome of the instant motion, the Court will consider them.

report a specific plan, Wilinski thought it was best that he remain on observation status. At the time of her evaluation, Wilinski was not aware of Blackshear having any dangerous objects in his cell.

Wilinski saw Blackshear again the following day, May 25, for another evaluation. Blackshear reported that the previous night he discovered that the assistance bar in his cell near the toilet was broken and he gave the bar to staff members. The defendants claim that Blackshear actually broke the assistance bar himself, but for the purposes of summary judgment, the Court will accept Blackshear's version of this event. He asked Wilinski to document that staff had placed a "suicidal man in a cell with this broken bar." (Docket #69 at 6). Wilinski discussed with Blackshear his references to himself as a "suicidal man," and Blackshear explained that he was not, in fact, suicidal the previous night. Blackshear also indicated he was not sure about his current thoughts of self-harm, so he remained on clinical observation status.

On May 26, Wilinski saw Blackshear again for evaluation of his mental status. Prior to meeting with Blackshear, Wilinski was informed by a doctor at RCI that Blackshear had found metal shards in his cell—left over from staff's removal of the assistance bar—which he gave to staff.[4] During the May 26 evaluation, Blackshear denied thoughts, plans, or intent of self-harm and reported that he felt safe to be released from observation status. Wilinski therefore recommended that he be released, and it appears he was then released.

---

[4]Blackshear filed grievances about the metal bar and metal shards that remained in his cell after the bar was removed. The grievances were affirmed, and Blackshear's cell was cleaned of debris. *See* (Docket #77-2).

On or around June 20, Blackshear was placed back on observation status because he started a hunger strike. Wilinski saw Blackshear several times for evaluation and monitoring during this time. Blackshear reported that he wanted to show the courts that the RCI security staff and health and psychological services personnel simply wanted him to waste away on observation status. On June 21, Blackshear found a metal screw in his observation cell, showed it to psychological services staff while being evaluated, and surrendered it. An incident report was written, which Amin, a lieutenant, reviewed. All appropriate institution staff were notified. Because Blackshear was on observation status, Amin did not feel that further action was necessary. Blackshear ended his hunger strike on June 26 and was removed from clinical observation status.

Blackshear's third placement on observation status began on June 30 after he covered his cell window with a towel and informed security staff that he was experiencing thoughts of harming himself and others. Blackshear had also been punching his cell window, causing his knuckles to bleed and leaving blood spots on the window. Blackshear confirmed that he had no other self-inflicted injuries at that time. He was taken to a hospital for evaluation of his hand, and an x-ray showed no acute damage. Band-Aids were placed over the abrasions on his hand. He was then placed on clinical observation status, with an officer sitting outside his cell monitoring him continuously.

On July 2, O'Neill, a captain, was called to Blackshear's unit because he was repeatedly punching the wall in his cell in an attempt to harm himself. Upon arriving at Blackshear's cell, O'Neill verbally attempted to get Blackshear to stop harming himself, but Blackshear continued punching the cell wall. O'Neill told Blackshear that the injury to his hand seemed

minor and that if his grandmother were there, she would tell him to rub dirt on it. Blackshear avers that he felt taunted and humiliated by this, because his grandmother and his parents had abandoned him.

O'Neill explained to Blackshear that if he would not stop harming himself, he may have to be placed in mechanical bed restraints for his safety. In response, Blackshear stated that he "had been trying to be placed in bed restraints for the last three days." (Docket #69 at 9). O'Neill consulted with the psychological services unit, and the together they decided Blackshear would be placed in mechanical bed restraints. Blackshear submitted to this without incident. His placement into bed restraints was captured on video, which the defendants have included with their summary judgment submission. No serious injury can be seen in the video.

Once he was restrained in a bed in his room, a nurse arrived to assess Blackshear's hand injury. She determined that his hand was not broken and that his vitals were stable. Then Dr. Kozmin conducted a psychological evaluation of Blackshear and determined that Blackshear would remain in the restraints for the full twelve hours. Following this, four checks were conducted on Blackshear by RCI staff. The checks included nursing staff checking vitals, allowing an opportunity for Blackshear to urinate, and conducting a range of motion procedure. At each of the four checks, Blackshear was offered water and the use of the portable urinal.

Blackshear was released from the bed restraints at 5:15 a.m. the next day. He was not resistive, he reported no injuries beyond the hand injury he sustained the day prior, and stated he had no plans to continue self-harming behavior. Blackshear continued to complain about pain and swelling in his hand, and he demanded an x-ray. Medical staff at RCI again assessed his hand and saw no need for further treatment beyond cleaning

the cut. Nonetheless, on July 6, RCI ordered an x-ray, which showed "[n]o fracture or dislocation." (Docket #71-1 at 117).

On July 8, as meals were being passed out in Blackshear's unit, Blackshear provided to correctional officer Freeman ("Freeman") a sharpened toothbrush and a small piece of a needle. He also informed Freeman officer that he had swallowed a piece of the needle. Freeman notified sergeant Vena, who then called the health services unit, from whom he received instructions to monitor Blackshear. The health services staff did not instruct Vena to do anything else. Vena notified lieutenant Jones about the items Blackshear had handed over.

Blackshear claims that he stabbed himself more than 100 times with one or both of these objects before he handed them over. But there is simply no evidence in the record to support Blackshear's story, apart from his own statement. Contemporaneous reports from correctional officers do not mention any stabbing. *See, e.g.,* (Docket #70-1 at 246) (observation log notes that Blackshear spoke with Lt. Jones at 1:15 p.m. and was asleep at 1:30 p.m.; does not note any injury); (Docket #70-2 at 10) ("Blackshear showed c/o Freeman an object that appeared to be a piece of a needle. He stated that he swallowed it. Lt. Jones notified + HSU."); (Docket #70-3 at 14) ("Blackshear reported to staff the swallowed a needle—HSU notified and gave staff directions, he also had a toothbrush but ofc got it from inmate."). Blackshear claimed in his second amended complaint that nurse Epping knew he had stabbed himself and denied him medical care, but Epping did not work on July 8. Blackshear's only evidence to the contrary is that Epping is the nurse usually present in the segregation unit, so he "assumed" she was working that day. (Docket #81 at 5). Blackshear was seen by psychological services staff as soon as two days later, the reports from whom make mention of

stabbing wounds or of Blackshear's complaints about pain from having stabbed himself. (Docket #72-1 at 272). Finally, Vena specifically denies that Blackshear had stabbed himself. (Docket #96 at 3) ("At no time on July 8, 2017 did Blackshear stab himself, especially not over 100 times. Blackshear provided an unknown object to staff, which was removed [from] his cell, and the Health Services Unit was contacted.").[5]

On July 21, Blackshear called Amin over to his cell and showed her several small wire-like pieces of metal that appeared to be pieces of staples or needles. Blackshear claims to have found them in his cell. Blackshear voluntarily placed the metals pieces into a Styrofoam cup so Amin could take them away. Amin disposed of the pieces of metal, notified the restrictive housing unit captain, and completed an incident report. The next day, July 22, Blackshear gave lieutenant Mayer three staple-like metal pieces that he reportedly found in his call. Blackshear allowed Mayer to take the metal pieces away without incident. Mayer told Blackshear that if

---

[5]Blackshear filed several motions to compel the defendants to give him photos of his injuries from the alleged stabbing. (Docket #47, #59, #60). Specifically, Blackshear wanted RCI to find video footage of him from July 8, capture still images of his alleged stabbing wounds, and print out copies of those images for his use in this case. *See* (Docket #86 at Exhibit W). Blackshear encloses of copy of an information request he submitted to RCI asking for the photos, which shows that RCI informed him it had no such video footage of him. *Id.* The defendants' discovery responses also indicate that RCI has no record of any photos of Blackshear's arms. *Id.* The defendants explain in their summary judgment brief that they have no record of Blackshear's alleged stabbing injury because he did not stab himself; they had no reason to refer him to a nurse to treat his stabbing wounds or document his stabbing wounds because he didn't have any. In fact, there is nothing in the record to suggest Blackshear even complained of a stabbing injury on July 8. That allegation appears to have been invented for this lawsuit. The Court will not compel the defendants to produce evidence they do not have. Blackshear's motions to compel will be denied.

found more items in his cell, he should report it to staff for immediate removal.

Wilinski saw Blackshear on July 25 for an evaluation. During this appointment, Blackshear reported that his thoughts of self-harm continued. Wilinski claims that during this appointment, Blackshear seemed more focused on suing RCI staff rather than working toward his personal growth. Wilinski completed several more mental status evaluations on Blackshear before he was ultimately removed from observation status on August 7, 2017.

Following his removal from observation, Blackshear saw a different psychiatrist, Dr. Chen. Whereas Dr. Castillo had found no evidence of mental illness during his evaluations of Blackshear, Dr. Chen diagnosed Blackshear with panic disorder and prescribed a psychiatric medication for him. Blackshear says the reason for the difference is that Dr. Chen took Blackshear seriously and Dr. Castillo had not. The defendants say that Blackshear reported new symptoms to Dr. Chen, including chronic night terror, panic attacks, depression, anxiety, and hallucinations. The medical staff at RCI who observed Blackshear regularly during observation, including Wilinski, claim that they did not see evidence of the symptoms Blackshear reported to Dr. Chen.

### 3.3    Metal Objects in Blackshear's Cell

When inmates are placed into observation status, they are only allowed property that is deemed appropriate by the psychological services unit staff. On occasion, inmates are allowed items from their personal property while on observation status in order to create the least restrictive environment possible. Any such property is scanned for contraband using a metal detection wand.

On several occasions, including during the summer of 2017 as described above, Blackshear was found to have small metal objects in his cell while on observation status. Staff came to suspect that Blackshear was sneaking contraband into his cell through his personal property. For example, on December 30, 2017, Blackshear requested his bible from his personal property. After he received the bible, he made superficial cuts to his arm. This prompted security staff to search his property, including his bible, where they found small pieces of razor blades. After removing the razor blade and returning the bible to Blackshear, staff observed him searching through his bible, presumably for the razor blade. Blackshear disputes that he snuck the razor blade into his cell; he says he found it in his cell and placed it in his bible. But he does not dispute that during an evaluation with Wilinski shortly after this incident, he admitted that he had placed the razor blade in his bible. He also reported that he was not having thoughts of self-harm.

Regardless of whether or not Blackshear was actually sneaking contraband into his cell through his personal property, it is undisputed that RCI decided to step up the screening of Blackshear's property in an effort to prevent him from gaining access to dangerous objects. The metal detection wand was not was sufficiently detecting the small pieces of metal, so RCI staff began taking Blackshear's property to be run through the metal detection scanner located at the entrance of the institution.

**4.    ANALYSIS**

Blackshear was permitted to proceed against the defendants on Eighth Amendment claims of deliberate indifference to his serious medical needs. His claims can be sorted into three categories. First, Blackshear claims that Dr. Castillo was deliberately indifferent to his serious mental

health conditions by failing to prescribe him psychiatric medication. Second, Blackshear claims that defendants Mayer, Tokar, Wilinski, O'Neill, and Amin, were deliberately indifferent to his risk of committing suicide or self-harm because they knew his cell contained dangerous materials and did not have it adequately cleaned or generally failed to protect Blackshear from himself. Finally, he claims that defendants Vena and Epping were deliberately indifferent because they knew he stabbed himself over 100 times on July 8, 2017 and did not get him medical assistance.

### 4.1    Prescription of Psychiatric Medication

First, Blackshear claims that Dr. Castillo was deliberately indifferent to his serious mental health conditions because he did not treat Blackshear with psychiatric medications. To show deliberate indifference, a plaintiff must prove that "(1) [he] had an objectively serious medical condition; (2) the defendants knew of the condition and were deliberately indifferent to treating [him]; and (3) this indifference caused [him] some injury." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010).

Even if the Court assumes that Blackshear's 2017 mental illness diagnoses from Dr. Chen—based on Blackshear's reports of chronic night terror, panic attacks, depression, anxiety, and hallucinations—were legitimate and serious medical conditions, satisfying the first element of his claim, Blackshear has failed to present evidence supporting the second element. That is, Blackshear has not created a triable issue as to whether Dr. Castillo was deliberately indifferent to Blackshear's mental health conditions by not prescribing medication.

In order to show that a medical professional acting in the scope of his employment acted with deliberate indifference to a known risk of

substantial harm, the plaintiff must show that the doctor's treatment decision was "so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). Mere "[d]isagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.* Instead, the plaintiff must show that "no minimally competent professional" would have made the treatment decision that the defendant made. *Id.*

Blackshear claims that Dr. Castillo was deliberately indifferent to his mental health because Dr. Castillo thought Blackshear had lied about his mental health history and, based on that belief, did not prescribe medication. The undisputed facts show that Dr. Castillo reasonably exercised his medical judgment in determining that Blackshear was not suffering from psychological illnesses warranting medication. This decision included consideration of, first, the reason for Blackshear's visit. Blackshear had asked for the appointment because he said he wanted medication, and the official who completed the referral indicated that Blackshear presented as "symptom free." (Docket #71-1 at 110). At the start of the evaluation, Blackshear asked Dr. Castillo to document that he suffered from several major metal disorders, and Dr. Castillo responded that he could not make those diagnoses at that time, so he would not document them. Dr. Castillo asked Blackshear about his medical history and received what he believed to be incomplete or inaccurate answers.

Dr. Castillo then reviewed available records about Blackshear's inmate medical history since his incarceration, which did not reveal a

mental illness diagnosis requiring medication. He requested medical records from the two hospitals where Blackshear claimed to have been treated in the past, and he rescheduled Blackshear for a follow-up visit, at which Dr. Castillo observed no new symptoms. Finally, Dr. Castillo received and reviewed records from at least one of the two hospitals where Blackshear had previously been treated. Those records revealed that Blackshear had suffered a traumatic brain injury from a violent beating in 2008 but did not reveal major mental illness. Blackshear then refused to see Dr. Castillo again.

Blackshear points to two things to demonstrate that Dr. Castillo did not properly exercise his medical judgment. First, Blackshear argues that he was in fact diagnosed with and treated for mental illnesses or behavior issues in his teenage years; the various medical and court records he submitted from his youth seem to support this. But Dr. Castillo did not have these records during his appointments with Blackshear, and, moreover, a prior diagnosis does not command that the diagnosis be repeated. Dr. Castillo's medical judgment was based on his real-time evaluation of Blackshear's symptoms (or lack of symptoms). And even if Dr. Castillo was ultimately wrong in his diagnosis, which has not been proven, his error was not the result of a deliberate failure to evaluate Blackshear's symptoms; it would reflect, at worst, negligence. Constitutional liability does not flow from negligence. *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010) ("Neither medical malpractice nor mere disagreement with a doctor's medical judgment is enough to prove deliberate indifference in violation of the Eighth Amendment.").

Next, Blackshear points is Dr. Chen's later decision to prescribe medication to Blackshear for panic disorder. *See* (Docket #71-1 at 105). This

is insufficient to show Dr. Castillo's deliberate indifference for at least two reasons. First, Blackshear reported different symptoms to Dr. Chen than to Dr. Castillo, and Dr. Chen's prescription related to a symptom reported only to him. Second, and more importantly, the fact that two doctors reach different conclusions after each reasonably exercises his medical judgment is not proof of deliberate indifference. *Pyles*, 771 F.3d at 409 ("Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation.").

Therefore, there is no evidence that Dr. Castillo's decision not to provide Blackshear with psychiatric medication was "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Duckworth v. Ahmad*, 532 F.3d 675, 680 (7th Cir. 2008) (quotation omitted). Because Blackshear has not presented evidence that would allow a jury to find that Dr. Castillo's decision not to provide Blackshear with psychiatric medication amounted to deliberate indifference, this claim will be dismissed.

### 4.2 Protecting Blackshear From Self-Harm

Next up is Blackshear's claim that Mayer, Tokar, Wilinski, O'Neill, and Amin were deliberately indifferent to his risk of committing suicide or self-harm by failing to rid his cell of dangerous metal objects and failing to stop him from cutting himself. The same elements of an Eighth Amendment claim explained above apply to this deliberate indifference claim as well. That is, to show deliberate indifference, Blackshear must prove that "(1) [he] had an objectively serious medical condition; (2) the defendants knew of the condition and were deliberately indifferent to treating [him]; and (3)

this indifference caused [him] some injury." *Gayton*, 593 F.3d at 620. The defendants argue that Blackshear has not created a jury question as to the first or second elements.

### 4.2.1   Serious Medical Condition

Blackshear claims his suicidality and threats of self-harm were objectively serious medical conditions, and that he suffered injuries from the cuts and stabs the defendants allowed him to inflict on himself. The defendants agree that Blackshear claimed, intermittently, to be suicidal and threatened to hurt himself, but they argue his threats were not genuine. Instead, they say, the evidence shows Blackshear's threats of self-harm where manipulation tactics employed to get desired medication and/or amass fodder for a lawsuit against the prison, and his self-harming incidents resulted in no serious injuries.

Generally, a completed or attempted suicide satisfies the "serious medical condition" element of a deliberate indifference claim. *Pittman ex rel. Hamilton v. Cty. of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014). However, a plaintiff still bears the burden to show that his suicidal ideation or the self-harm he inflicted was indeed "objectively [and] sufficiently" serious. *Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006). Prison officials' refusal to treat "the sniffles or minor aches and pains or a tiny scratch or a mild headache or minor fatigue — the sorts of ailments for which many people who are not in prison do not seek medical attention," does not violate the Eighth Amendment. *Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996).

The evidence demonstrates that Blackshear did not have a serious medical need, either in suicidal ideation or in his self-inflicted wounds. True enough, Blackshear claimed to be suicidal, and so was placed in observation status. But no other evidence demonstrates that, during the

relevant time period, Blackshear intended to or genuinely tried to harm himself. After punching the wall repeatedly on July 2, 2017, Blackshear had cuts on his knuckles but no fracture or dislocation. On July 8, 2017 when he allegedly swallowed part of a needle and stabbed himself over 100 times, he had no documented injury. Surely if his 100 stabbing wounds were serious, he would have lasting injuries. In a psychiatric exam on July 12, 2017, four days after allegedly stabbing himself hundreds of times and swallowing part of a needle, Blackshear denied that he was suicidal or homicidal. On this evidence, no reasonable jury could find that Blackshear suffered from a *legitimate* objectively serious medical condition. *See Hale v. Rao*, 768 F. Supp. 2d 367, 379–80 (N.D.N.Y. 2011) ("Plaintiff cannot establish that the superficial injury stemming from the staple he stuck into the top of his foot or the scarred-over self-inflicted wound resulting from the paper clip he inserted into his abdomen are sufficiently serious conditions.").

### 4.2.2   Deliberate Indifference

Even if Blackshear's self-harm threats presented a sufficiently serious risk of harm to implicate the Eighth Amendment, the evidence shows that the defendants were not deliberately indifferent in responding to that risk.

With respect to self-harming or suicidal behavior, the deliberate indifference component of an Eighth Amendment claim requires "a dual showing that the defendant: (1) subjectively knew the prisoner was at substantial risk of committing suicide and (2) intentionally disregarded the risk." *Collins*, 462 F.3d at 761 (citations omitted). The *Collins* court further explained that

> [w]ith respect to the first showing, "it is not enough that there
> was a danger of which a prison official should have been

aware," rather, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Estate of Novack*, 226 F.3d at 529 (emphasis added). In other words, the defendant must be cognizant of the significant likelihood that an inmate may imminently seek to take his own life. *Id.*; [*Sanville v. McCaughtry*, 266 F.3d 724, 737 (7th Cir. 2001)] (issue is whether the defendant was subjectively "aware of the substantial risk that [the deceased prisoner] might take his own life"). Liability cannot attach where "the defendants simply were not alerted to the likelihood that [the prisoner] was a genuine suicide risk." *Boncher ex rel. Boncher v. Brown County*, 272 F.3d 484, 488 (7th Cir. 2001).

. . .

[As to the second showing], [d]eliberate indifference requires a showing of "more than mere or gross negligence, but less than the purposeful or knowing infliction of harm." *Matos*, 335 F.3d at 557; *Estate of Novack*, 226 F.3d at 529. We have characterized the required showing as "something approaching a total unconcern for [the prisoner's] welfare in the face of serious risks." *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir. 1992). To establish deliberate indifference, a plaintiff must present evidence that an individual defendant intentionally disregarded the known risk to inmate health or safety. *Matos*, 335 F.3d at 557. A defendant with knowledge of a risk need not "take perfect action or even reasonable action[,] ... his action must be reckless before § 1983 liability can be found." *Cavalieri v. Shepard*, 321 F.3d 616, 622 (7th Cir. 2003).

. . .

[In sum,] [t]he deliberate indifference standard imposes a "high hurdle" for a plaintiff to overcome.

*Id.* at 761–62.

Thus, while prison staff are expected to protect inmates from self-harm, *Taylor v. Wausau Underwriters Ins. Co.*, 423 F. Supp. 2d 882, 889 (E.D. Wis. 2006), "[a] risk of future harm must be 'sure or very likely' to give rise to 'sufficiently imminent dangers' before an official can be liable for

ignoring that risk." *Davis-Clair v. Turck*, 714 F. App'x 605, 606 (7th Cir. 2018) (quoting *Baze v. Rees*, 553 U.S. 35, 50 (2008) (Roberts, C.J., plurality opinion)).

In this case, the evidence shows that the defendants kept careful watch over Blackshear from the moment he expressed an urge to harm himself. He was placed in observation, where he was checked on every fifteen minutes. He had regular meeting with a psychologist. When he informed staff that he found a loose assistance bar or small metal objects in his cell, the defendants promptly took the items away from Blackshear, who gave them up voluntarily. When Blackshear made reference to himself as a "suicidal man" who had access to sharp metals objects, Wilinski examined Blackshear further and he admitted he did not intend to harm himself or have any specific plans to harm himself. There is no evidence that the defendants believed, or had reason to believe, Blackshear intended to harm himself with the metal objects he found in his cell. To the contrary, the evidence shows that Blackshear simply intended to set defendants up for a lawsuit by manufacturing a risk of danger in his cell. Finally, the defendants acted on their suspicion that Blackshear was sneaking the small metal objects into his cell through his personal property by stepping up their screening of his property.

When Blackshear did actually cause himself some (minor) harm by punching a wall on June 30 and July 2, the defendants responded by stopping the self-harming behavior and evaluating Blackshear's hand for injury. The x-rays from these incidents showed no serious damage; Blackshear required nothing more than Band-Aids and ointment. In response to the second of these two incidents, the defendants escalated their response by placing Blackshear in bed restraints until he had calmed down and had been evaluated by a psychologist.

Blackshear's suicidality and the defendants' response thereto stands in contrast to cases like *Pittman*, 746 F.3d at 772, where the officers totally ignored the inmate's requests for crisis counseling, or *Sanville*, 266 F.3d at 739, where prison guards left a suicidal inmate in his cell, unsupervised, for hours. By contrast, it is indisputable here that Blackshear was placed on clinical observation immediately when he expressed an intent to harm himself and was released only after he denied ongoing thoughts of self-harm. It is also indisputable that staff removed dangerous objects from his cell when they learned of them and endeavored to find where the objects were coming from in order to prevent future harm. These responses to Blackshear's self-harm risk fall far short of "a total unconcern for [his] welfare." *Duane*, 959 F.2d at 677. The defendants' efforts to monitor and counsel Blackshear, despite their doubts about the sincerity of his self-harm threats, demonstrates not indifference but an overall concern for Blackshear's wellbeing. *See Bowers v. Pollard*, 602 F. Supp. 2d 977, 993 (E.D. Wis. 2009) (noting that a suicidal inmate presents prison officials with "a dilemma with no easy options").

On this evidence, no reasonable jury could find that the defendants were deliberately indifferent; instead, they responded reasonably to the risk of harm to Blackshear. *See Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002) ("[P]rison officials who actually knew of a substantial risk to inmate health or safety are free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted, because in that case it cannot be said that they were deliberately indifferent.").

### 4.3    Medical Attention for Alleged Stabbing Wounds

Finally, Blackshear claims that Vena and Epping were deliberately indifferent because they knew he stabbed himself over 100 times on July 8, 2017 and did not get him medical assistance.

The claim against Epping fails from the start because the undisputed facts show that she did not work on July 8. Individual liability under Section 1983 "requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of Chi.*, 851 F.3d 649, 657 (7th Cir. 2017). Because Epping could not have been personally involved in the alleged deprivation, the claim against her cannot proceed.

His claim against Vena also fails, because he did not experience a substantial risk of serious harm on July 8 and, even if he had, Vena responded reasonably. On that day, Blackshear voluntarily handed over to officer Freeman a piece of a needle and a sharpened toothbrush. He *claimed* he had harmed himself by swallowing a piece of the needle but showed no signs of distress. There is no evidence that he claimed to have stabbed himself at that time, and there is no evidence that he actually suffered an injury from the alleged stabbings. Therefore, there is no evidence of a serious risk of harm.

Freeman told Vena about the incident, and Vena contacted the health services unit to alert them about Blackshear possibly having swallowed a sharp piece of metal. Vena received instructions to monitor Blackshear and was advised that he need not bring Blackshear to the health services unit at that time. Vena is entitled to rely on the advice of the prison's medical staff about Blackshear's alleged injury. *See McGee v. Adams*, 721 F.3d 474, 483 (7th Cir. 2013) (prison guards entitled to rely on medical staff determination to not exempt plaintiff from leg restraint requirement during transport).

Therefore, even if Blackshear had presented a serious risk of harm from swallowing a metal object—the only self-harming act Blackshear alerted staff about—Vena responded reasonably.

**5.      MISCELLANEOUS MOTIONS**

Blackshear has filed many, many miscellaneous motions that do not affect the outcome of this case but that the Court must nonetheless address.

On June 3, 2019, Blackshear filed his own motion for summary judgment. (Docket #53). In response, the defendants filed a motion to strike, citing the inadequacies with Blackshear's filing. (Docket #55). On August 13, 2019, Blackshear notified the Court that he agreed with the defendants that his summary judgment motion should be stricken. (Docket #65). Therefore, the Court will grant the defendant's motion and will strike Blackshear's summary judgment motion.

Next, Blackshear filed several motions over the course of this litigation asking that the Court instruct RCI to give him his pen back, or to give him a pen instead of a pencil, or to find that RCI had violated his due process rights by withholding a pen, or to preliminary enjoin the defendants from not giving him a pen. (Docket #48, #62, #84, #85, #88, #89, and #91). Several of Blackshear's submissions were indeed difficult to read because the pencil prose did not scan well. However, that problem was resolved after Blackshear submitted darker copies. Blackshear also filed a motion seeking daily "legal recreation" time so he could complete his litigation tasks. (Docket #51). He was able to submit everything required of him in this case (and more), so it does not appear his lack of court-mandated law library time prejudiced him. The motions regarding use of a pen and legal recreation time will be denied.

Finally, Blackshear filed a motion for the appointment of counsel. (Docket #64). He claims that his traumatic brain injury "effect[s] his thought process," presumably making it more difficult to understand the legal issues and procedure in this case, and that he spends significant time in observation where he is not permitted to write pleadings or motions. *Id.* He attached letters from several law firms declining to take his case. (Docket #64-1). Recruited counsel is not appropriate for this case.

Blackshear has demonstrated that he is capable of completing the necessary tasks of litigation, including marshalling evidence and responding to the defendants' arguments and factual submissions. He has not explained or demonstrated how his traumatic brain injury has negatively affected his performance. Further, the issues in this case, as shown above, are not overly complex. The Court cannot say that "'the difficulty of the case—factually and legally—exceeds [Blackshear's] capacity as a layperson to coherently present it.'" *Navejar v. Iyiola*, 718 F.3d 692, 696 (7th Cir. 2013) (quoting *Pruitt v. Mote*, 503 F.3d 647, 655 (7th Cir. 2007) (en banc)). Finally, Blackshear's lack of legal training and his limited access to resources in prison, while unfortunate, bring him in line with practically every other prisoner litigating in this Court. District courts cannot be expected to appoint counsel in circumstances which are common to all or many prisoners. *See Bracey v. Grondin*, 712 F.3d 1012, 1017–18 (7th Cir. 2013); *Pruitt*, 503 F.3d 647, 656 (observing that the Seventh Circuit has "resisted laying down categorical rules regarding recruitment of counsel in particular types of cases"). Doing so would place untenable burdens on court resources. The motion will be denied.

6.      **CONCLUSION**

On the undisputed facts in the record, summary judgment is appropriate in favor of the defendants.[6] The Court must, therefore, grant the defendants' motion, and dismiss this action with prejudice.

Accordingly,

**IT IS ORDERED** that the John and Jane Doe Defendants be and the same are hereby **DISMISSED**;

**IT IS FURTHER ORDERED** that the Plaintiff's motions to compel (Docket #47, #59, and #60) be and the same are hereby **DENIED**;

**IT IS FURTHER ORDERED** that the Plaintiff's motions regarding a writing instrument (Docket #48, #62, #84, #85, #88, #89, and #91) be and the same are hereby **DENIED**;

**IT IS FURTHER ORDERED** that the Plaintiff's motion for daily legal recreation time (Docket #51) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that the Plaintiff's motion to appoint counsel (Docket #64) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that the Defendants' motion to strike (Docket #55) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that the Plaintiff's motion for summary judgment (Docket #53) be and the same is hereby **STRICKEN**;

**IT IS FURTHR ORDERED** that the Defendants' motion for summary judgment (Docket #67) be and the same is hereby **GRANTED**; and

---

[6]Because the Court finds summary judgment is appropriate on the merits on all of Blackshear's claims, the Court does not reach the defendants' request for application of the doctrine of qualified immunity.

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 13th day of March, 2020.

BY THE COURT:

_____
J. P. Stadtmueller
U.S. District Judge